EXHIBIT  A

CERTIFIED LAND PATENT
Declaration of Assignees Update of Patent

ENT  52870:2020 PG 1 of 11
JEFFERY SMITH
UTAH COUNTY RECORDER
2020 Apr 22 11:22 am FEE 40.00 BY MA
RECORDED FOR CROMER, PAUL-KENNETH

Assignee's Update of Patent (to bring patent current)
RECORDING REQUESTED BY                                    }
AND WHEN RECORDED MAIL TO                                 )

    Paul & Barbara Cromar                             )
      and  Barbara Ann Cromar                       )
    c/o  9870 N. Meadow Drive                         )
    Cedar Hills, Utah  [84062]                       )

RECORDER'S USE

# DECLARATION OF ASSIGNEES UPDATE OF PATENT

LAND PATENT NUMBER #392

KNOW ALL MEN BY THESE PRESENTS:

THAT _Paul-Kenneth. Cromar._
AND _Barbara-Ann: Cromar._____ DO SEVERALLY CERTIFY AND
DECLARE THAT _We_ ((WE/I) BRING UP THIS LAND PATENT IN _our_ ((OUR/MY)
NAME(S).

(1) THE CHARACTER OF SAID PROPERTY SO SOUGHT TO BE PATENTED, AND
LEGALLY DESCRIBED AND REFERENCED UNDER PATENT NUMBER LISTED
ABOVE, WITH TWENTY-ONE DOLLARS SILVER COIN AS DUE CONSIDERATION, IS:

    Based on the original United States Land Patent #392 / Homestead
    Certificate 1136 / Application 1864 of May 20, 1882  as secured by Edward
    Meredith[see attached BLM 4-10-2020 Certified copy]; from which a part and
    parcel of the last lawful description of August 29, 1882 / Edward Meredith to
    Joseph Halliday [Bk S - pg 489], lawfully described as follows:

        "This indenture, made the twenty ninth day of August in the year of
        our Lord One thousand eighteen hundred and eighty two Between
        Edward Meredith of the County of Utah and Territory of Utah party of
        the first part, and Joseph Halliday of the same place the party of the
        second part, witnesseth, that the said party of the first part, for and in
        consideration of the sum of three hundred and fifty (350) dollars
        lawful money of the United States of America to him in hand paid by
        the said party of the second part, the receipt whereof is hereby
        acknowledged, has remised, released and forever quit clamed, and by
        these presents does remise, release and forever  quit-claim unto the

said party of the second part , and to his  heirs and assigns forever, all that certain? piece or parcel of land known and described as follows to wit:  Beginning at the South East corner of Section six (6) Township five (5) South of Range 2, East Salt Lake City Meridian, Thence North one hundred and sixty rods.  Thence West forty rods. Thence South one hundred and sixty rods.  Thence East forty rods, to the place of beginning–continuing forty acres. –Together with all and singular the tenements and appurtenances thereunto belonging, or in anywise appertaining and the reversure [?] and reversion [?], remainder[?] and remainders [?], rents [?], issues, and profits thereof:  and also all the estate right, title, interest, property, possessum, claim and demand whatever, as well in law [?] as in equity of the said property of the first part, of, in or to the said premises, and every part and parcel thereof, with the appurtenances.  To Have and to Hold all in singular and said premises, together with the appurtenances the said party of the second part, and to his heirs and assigns forever.  In Witness Whereof, the said party of the first part, has hereunto set his hand and seal the day and year first above written.   Signed and sealed.  Edward Meredith."

With a <u>lawful</u> 1997 description of the specific part and parcel thereof, as filed within coordinates as:

| | |
|---|---|
| North boundary: | **S 89'45'59" W (165.061')** |
| South boundary: | **S 89'59'43" W (149.205')** |
| West boundary: | **N 00'13'59" W (80.494')** |
| East boundary: | **N 00'18'49" W (96.094')** |

[see Surveyor's Certificate of 5/3/97, containing the above metes and bounds as filed by Victor E. Hansen, filed in Utah County Records office under  97-222 on a survey to "RESET PRPERTY CORNERS FOR LOT 3 NORTH MEADOW ESTATES, PLAT C, AND LOT 32 NORTH MEADOW ESTATES PLAT  B, INCLUDING ADDITIONAL PROPERTY NORTH OF LOT 32.  THE BASIS OF BEARING IS THE SUBDIVISION SURVEY CONTROL MONUMENTS."]

[ AND as Previously referenced in the Utah County land records as: Subdivision Map Filing "Legal description: LOT 3, Plat C, AMENDED NORTH MEADOW EST. SUB. / Serial Number: 47:059:0003 / Serial Life 1981. / Property Address: 9870 MEADOW – CEDAR HILLS / Last documentation: 121145-2008 .]

(2) NOTICE OF PRE-EMPTIVE RIGHT. PURSUANT TO THE DECLARATION OF INDEPENDENCE [1776], THE TREATY OF PEACE WITH GREAT BRITAIN (8 STAT. 80) KNOWN AS THE TREATY OF PARIS [1793, AN ACT OF CONGRESS [3 STAT. 566, APRIL 24,1824], THE OREGON TREATY [9 STAT. 869 , JUNE 15, 1846], THE

HOMESTEAD ACT [12 STAT. 392,1862] AND 43 USC SECTIONS 57, 59, AND 83; THE RECIPIENT HEREOF IS MANDATED BY ART. VI SECTIONS 1, 2, AND 3; ART. IV SECTIONS I CL. 1, & 2; SECTION 2 CL. 1 8t 2 ; SECTION 4; THE 4TH, 7TH, 9TH, AND 10TH AMENDMENTS [U.S. CONSTITUTION, 1781-91] TO ACKNOWLEDGE ASSIGNEE'S UPDATE OF PATENT PROSECUTED BY AUTHORITY OF ART. III SECTION 2 CL. 1 &2 AND ENFORCED BY ORIGINAL/EXCLUSIVE JURISDICTION THEREUNDER AND IT IS THE ONLY WAY A PERFECT TITLE CAN BE HAD IN OUR NAMES, WILCOX vs. JACKSON, 13 PET. (U.S.) 498, 101. ED. 264; ALL QUESTIONS OF FACT DECIDED BY THE GENERAL LAND OFFICE ARE BINDING EVERYWHERE. AND INJUNCTIONS AND MANDAMUS PROCEEDINGS WILL NOT LIE AGAINST IT, LITCHFIELD vs. THE REGISTER, 9 WALL. (U.S.) 575, 19 L. ED. 681. THIS DOCUMENT IS INSTRUCTED TO BE ATTACHED TO ALL DEEDS AND/OR CONVEYANCES IN THE NAMES) OF THE ABOVE PARTY(IES) AS REQUIRING RECORDING OF THIS DOCUMENT, IN A MANNER KNOWN AS NUNC PRO TUNC [AS IT SHOULD HAVE BEEN DONE IN THE BEGINNING], BY ORDER OF UNITED STATES SUPREME LAW MANDATE AS ENDORSED BY CASE HISTORY CITED.

(3) NOTICE AND EFFECT OF A LAND PATENT. A GRANT OF LAND IS A PUBLIC LAW STANDING ON THE STATUTE BOOKS OF THE UTAH STATE, AND IS NOTICE TO EVERY SUBSEQUENT PURCHASER UNDER ANY CONFLICTING SALE MADE AFTERWARD; WINEMAN vs. GASTRELL, 54 FED 819, 4 CCA 596, 2 US APP 581. A PATENT ALONE PASSES TITLE TO THE GRANTEE; WILCOX vs. JACKSON, 13 PET (U.S.) 498, 10. L. ED. 264. WHEN THE UNITED STATES HAS PARTED WITH TITLE BY A PATENT LEGALLY ISSUED, AND UPON SURVEYS LEGALLY MADE BY ITSELF AND APPROVED BY THE PROPER DEPARTMENT, THE TITLE SO GRANTED CANNOT BE IMPAIRED BY ANY SUBSEQUENT SURVEY MADE BY THE GOVERNMENT FOR ITS OWN PURPOSES; CAGE vs. DANKS, 13, LA.ANN. 128. IN THE CASE OF EJECTMENT, WHERE THE QUESTION IS WHO HAS THE LEGAL TITLE. TILE PATENT OF THE GOVERNMENT IS UNASSAILABLE, SANFORD vs. SANFORD, 139 US 642. THE TRANSFER OF LEGAL TITLE (PATENT) TO PUBLIC DOMAIN GIVES THE TRANSFEREE THE RIGHT TO POSSESS AND ENJOY THE LAND TRANSFERRED, GIBSON vs. CHOUTEAU, 80 US 92. A PATENT FOR LAND IS THE HIGHEST EVIDENCE OF TITLE AND IS CONCLUSIVE AS EVIDENCE AGAINST THE GOVERNMENT AND ALL CLAIMING UNDER JUNIOR PATENTS OR TITLES, UNITED STATES vs. STONE, 2 US 525. ESTOPPEL HAS BEEN MAINTAINED AS AGAINST A MUNICIPAL CORPORATION (COUNTY). BEADLE vs. SMYSER, 209 US 393. UNTIL IT ISSUES, THE FEE IS IN THE GOVERNMENT, WHICH BY THE PATENT PASSES TO THE GRANTEE, AND HE IS ENTITLED TO ENFORCE POSSESSION IN EJECTMENT, BAGNELL vs. BRODERICK, 13 PETER (US) 436. STATE STATUTES THAT GIVE LESSER AUTHORITATIVE OWNERSHIP OF TITLE THAN THE PATENT CAN NOT EVEN BE BROUGHT INTO FEDERAL COURT, LANGDON vs. SHERWOOD, 124 U.S. 74, 80. THE POWER OF CONGRESS TO DISPOSE OF ITS LAND CANNOT BE INTERED WITH, OR ITS EXERCISE EMBARRASSED BY ANY STATE LEGISLATION; NOR CAN SUCH LEGISLATION DEPRIVE THE GRANTEES OF THE UNITED STATES OF THE POSSESSION AND ENJOYMENT OF THE PROPERTY GRANTED BY REASON OF ANY DELAY IN THE TRANSFER OF THE TITLE AFTER THE INITIATION OF

3

ENT   52870:2020 PG 4 of 11

PROCEEDINGS FOR ITS ACQUISITION. [GIBSON vs. CHOUTEAU.13 WAL. (U.S.) 92, 93.

(4) LAND TITLE AND TRANSFER THE EXISTING SYSTEM OF LAND TRANSFER IS A LONG AND TEDIOUS PROCESS INVOLVING THE OBSERVANCE OF MANY FORMALITIES AND TECHNICALITIES, A FAILURE TO OBSERVE ANY ONE OF WHICH MAY DEFEAT THE TITLE. EVEN WHERE THESE HAVE BEEN MOST CAREFULLY COMPLIED WITH. AND WHERE THE TITLE HAS BEEN TRACED TO ITS SOURCE, THE PURCHASER MUST BE AT HIS PERIL, THERE ALWAYS BEING IN SPITE OF THE UTMOST CARE AND EXPENDITURE- THE POSSIBILITY THAT HIS TITLE MAY TURN OUT BAD: YEAKLE, TORRENCE SYSTEM. 209. PATENTS ARE ISSUED (AND THEORETICALLY PASSED) BETWEEN SOVEREIGNS LEADING FIGHTER vs COUNTY OF GREGORY, 230 N. W.2d 114, 116.

THE PATENT IS PRIMA FACIE CONCLUSIVE EVIDENCE OF TITLE, MARSH vs BROOKS, 49 U.S. 223,233.

AN ESTATE IN INHERITANCE WITHOUT CONDITION. BELONGING TO THE OWNER AND ALIENABLE BY HIM, TRANSMISSIBLE TO HIS HEIRS ABSOLUTELY AND SIMPLY, IS AN ABSOLUTE ESTATE IN PERPETUITY AND THE LARGEST POSSIBLE ESTATE A MAN CAN HAVE. BEING IN FACT ALLODIAL IN ITS NATURE, STANTON vs SULLIVAN, 63 R.l. 216 7 A. 696. THE ORIGINAL MEANING OF A PERPETUITY IS AN INALIENABLE, INDESTRUCTIBLE INTEREST. BOUVIER'S LAW DICTIONARY, VOLUME III P. 2570, (1914).

IF THIS LAND PATENT IS NOT CHALLENGED, AS STATED ABOVE, WITHIN 60 DAYS IT THEN BECOMES OUR/MY PROPERTY, AS NO ONE ELSE HAS FOLLOWED THE PROPER STEPS TO GET LEGAL TITLE, THE FINAL CERTIFICATE OR RECEIPT ACKNOWLEDGING THE PAYMENT IN FULL BY A HOMESTEADER OR PREEMPTOR IS NOT LEGAL EFFECT A CONVEYANCE OF LAND. U.S. vs STEENERSON. 50 FED 504,1 CCA 552,4 U.S. APP. 332.

A LAND PATENT IS A CONCLUSIVE EVIDENCE THAT THE PATENT HAS COMPLIED WITH THE ACT OF CONGRESS AS CONCERNS IMPROVEMENTS ON THE LAND, ETC JANKINS vs GIBSON, 3 LA ANN 203.

(5) LAW ON RIGHTS, PRIVILEGES, AND IMMUNITIES; TRANSFER BY PATENTEE .....”TITLE AND RIGHTS OF BONA FIDE PURCHASER FROM PATENTEE..........WILL BE PROTECTED”. UNITED STATES vs DEBELL, 227 F 760 (C8 SD 1915), UNITED STATES vs. BEAMON, 242 F 876, (CA8 COLO. 1917): STATE vs HEWITT LAND CO., 74 WASH 573, 134 P 474. FROM 43 USC & 15 n 44. AS AN ASSIGNEE, WHETHER HE BE THE FIRST, SECOND OR THIRD PARTY TO WHOM TITLE IS CONVEYED SHALL LOSE NONE OF THE ORIGINAL RIGHTS, PRIVILEGES OR IMMUNITIES OF THE ORIGINAL GRANTEE OF LAND PATENT. “NO STATE SHALL IMPAIR THE OBLIGATIONS OF CONTRACTS”. UNTIED STATES CONSTITUTION ARTICLE I SECTION 10.

(6) EQUAL RIGHTS: PRIVILEGES AND IMMUNITIES ARE FURTHER PROTECTED UNDER THE 14TH AMENDMENT TO THE U.S. CONSTITUTION, " NO STATE... SHALL DENY TO ANY PERSON WITHIN ITS JURISDICTION THE EQUAL PROTECTION OF THE LAWS".

IN CASES OF EJECTMENT, WHERE THE QUESTION IS WHO HAS THE LEGAL TITLE THE PATENT OF THE GOVERNMENT IS UNASSAILABLE. SANFORD vs. SANFORD, 139 U.S. 642, 35 L ED 290 IN FEDERAL COURTS THE PATENT IS HELD TO BE THE FOUNDATION OF TITLE AT LAW. FENN vs. HOLMES, 21 HOWARD 481.

IMMUNITY FROM COLLATERAL ATTACK: COLLINS vs. BARTLETT, 44 CAL 371; WEBER vs. PERE MARQUETTE BOOM CO.,62 MICH 626, 30 N. W. 469; SURGET vs. DOE, 24 MISS 118; PITTSMONT COPPER CO. vs. VANINA, 71 MONT. 44, 227 PAC 45; GREEN vs. BARKER 47 NEB 934 66 NW 1032

(7) DISCLAIMER; ASSIGNEE'S SEIZEN IN DEED, AND LAWFUL ENTRY IS INCLUSIVE OF SPECIFICALLY THAT A CERTAIN LAWFULLY DESCRIBED PART AND PARCEL PORTION OF THE ORIGINAL LAND GRANT OR PATENT NO. #392 AND NOT THE WHOLE THEREOF, INCLUDING HEREDITAMENT, TEMEMENTS, PRE-EMPTION RIGHTS APPURTENANT THERETO. THE RECORDING OF THIS INSTRUMENT SHALL NOT BE CONSTRUED TO DENY OR INFRINGE UPON ANY OTHERS RIGHT TO CLAIM THE REMAINING PORTION THEREOF. ANY CHALLENGES TO THE VALIDITY OF THIS DECLARATION & NOTICE ARE SUBJECT TO THE LIMITATIONS REFERENCED HEREIN. ADDITIONALLY; A COMMON COURTESY OF SIXTY (60) DAYS IS STIPULATED FOR ANY CHALLENGES HEERETO. OTHERWISE. LACHES/ESTOPPEL SHALL FOREVER BAR THE SAME AGAINST ALLODIAL FREEHOLD ESTATE; ASSESSMENT LIEN THEORY TO THE CONTRARY (ORS 275.130), INCLUDED.

THE FOLLOWING DOCUMENTS ARE ATTACHED TO THIS DECLARATION, CERTIFIED COPY OF ORIGINAL LAND GRANT OR PATENT, DECLARATION OF HOMESTEAD CERTIFICATE 1136 / APPLICATION 1864, LAWFUL DESCRIPTION OF A PART AND PARCEL OF SAID GRANTOR PATENT.

X by: Paul-Kumit: C.

X by: Barbara-Ann: Cronar.

ASSIGNEE(S)

ACKNOWLEDGMENT                                    [CONTINUED...]

5

## NOTARY WITNESS

Utah State )

Utah County )

On 22nd April, 2020 before me, K. Usher personally
appeared Paul Kenneth Cromar and Barbara Ann Cromar personally known
to me to be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacity, and that
by his and her signature on the instrument the person or the entity upon behalf of
which the person acted, executed the instrument.

WITNESS my hand and official seal

K. USHER
NOTARY PUBLIC·STATE OF UTAH
COMMISSION# 695730
COMM. EXP. 06-23-2021

_____ Signature of Notary

When Recorded, Return To:      Paul Kenneth: Cromar
                               and Barbara Ann Cromar
                               c/o  9870 N. Meadow Drive
                               Cedar Hills, Utah  [84062]

6

490

United States of America

Territory of Utah &S.S.

County of Utah. On this twenty-ninth day of August A.D. One thousand eight hundred and eighty two personally appeared before me Elijah Manheim a Notary Public in and for said County Edward Merideth whose name is subscribed to the annexed instrument as a party thereto, personally known to me to be the same person described in, and who executed the said annexed instrument as a party thereto, and duly acknowledged to me that he executed the same freely and voluntarily, and for the uses and purposes therein mentioned. In Witness Whereof, I have hereunto set my hand and affixed my official seal, at my office in said County the day and year in this certificate first above written.

Elijah Manheim
Notary Public

(Seal)

(4-408)   The United States of America,

To all to whom these presents shall come, Greetings: Whereas, There has been deposited in the General Land Office of the United States a Certificate of the Register of the Land Office at Salt Lake City, Utah Territory, whereby it appears, that pursuant to the Act of Congress approved 20th May, 1862, "To secure Homesteads to actual Settlers on the Public Domain," and the acts supplemental thereto, the claim of John F. Bollows has been established and duly consummated, in conformity to law, for the South East quarter of Section eight in township eight South of Range Two East of Salt Lake Meridian, in Utah Territory, containing One hundred and sixty Acres, according to the Official Plat of the Survey of the said Lands, returned to the General Land Office by the Surveyor General.

Now Know Ye, That there is therefore, granted by the United States unto the said John F. Bollows the tract of Land above described: To have and to hold the said tract of land, with the appurtenances thereof, unto the said John F. Bollows and to his heirs and assigns forever: subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws, and decisions of courts and also subject to the right of the proprietor of a vein or lode to extract and remove his ore therefrom, should the same be found to penetrate or intersect the premises hereby granted, as provided by law. In Testimony Whereof I Chester A. Arthur, President of the United States of America have caused these letters to be made Patent, and the seal of the General Land Office to be hereunto affixed. Given under my hand, at the City of Washington, the seventh day of January, in the year of our Lord One thousand eight hundred and eighty five, and of the Independence of the United States the one hundred and ninth.

By the President
Chester A. Arthur
By M. Mc. Kean

Secretary

(Seal)

S. N. Clark. Recorder of the General Land Office

Recorded Vol. 4. page 7⅔

BKS
pg 489

Whereof I have hereunto set my hand at my office in Goshen Precinct, Utah County Territory of Utah the day and year in this certificate first above written

Eleazer Edwards
Justice of the Peace for Goshen Precinct Utah County

United States of America ss
Territory of Utah § s.s.
County of Cache § On the fifth day of April A.D. One thousand eight hundred and eighty five, personally appeared before me W. W. Maughan a Notary Public in and for said County William Hoggensen proven to me by the oath of James Henderson, a competent witness by me duly sworn for that purpose, to be the same person described in and who executed the said annexed instrument as a party thereto and the said William Hoggensen duly acknowledged to me that he executed the same freely and voluntarily, and for the uses and purposes therein mentioned. In Witness whereof I have hereunto set my hand and affixed my Official Seal at my office in Logan City Utah the day and year in this certificate first above written.

W. W. Maughan
Notary Public

[Seal]

This Indenture, Made the twenty ninth day of August in the year of our Lord one thousand eight hundred and eighty two Between Edward Merideth of the County Utah and Territory of Utah party of the first part, and Joseph Halliday, of the same place the party of the second part. Witnesseth, That the said party of the first part, for and in consideration of the sum of three hundred and fifty (350) Dollars lawful money of the United States of America to him in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, has remised, released and forever quit claimed, and by these presents does remise, release and forever quit claim unto the said party of the second part, and to his heirs and assigns forever, all that certain piece or parcel of land herein and described as follows to Wit: Beginning at the South East corner of Section Six (6) Township five (5) South of Range 2 East Salt Lake City Meridian. Thence North One hundred and sixty rods. thence West forty rods. Thence South One hundred and sixty rods, Thence East forty rods, to the place of beginning - Containing Forty Acres. - Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining and the reversion and reversions, remainder and remainder, rents, issues, and profits thereof; and also all the estate right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity of the said party of the first part of, in or to the said premises, and every part and parcel thereof, with the appurtenances To have and to Hold all and singular the said premises, together with the appurtenances the said party of the second part, and to his heirs, and assigns forever. In Witness Whereof, the said party of the first part, has hereunto set his hand and seal the day and year first above written.

Signed sealed and delivered in the presence of
E. Maughan
Maurits P. Anderson.

Edward Merideth [Seal]

ENT 52870:2020 PG 8 of 11

392

# The United States of America,

To all to whom these Presents shall come, Greeting:

Homestead Certificate No. 15-

Application No. 8--

**Whereas,** There has been deposited in the General Land Office of the United States a Certificate of the Register of the Land Office at *Salt Lake Utah Territory* , whereby it appears that, pursuant to the Act of Congress approved 20th May, 1862, "To secure Homesteads to actual Settlers on the Public Domain," and the acts supplemental thereto, the claim of *Edward Meredith*

has been established and duly consummated, in conformity to law, for the *south east quarter of section one in township five south of range two east of Salt Lake Meridian in Utah Territory containing one hundred and sixty acres*

> Bureau of Land Management
> Utah State Office
> 440 West 200 South, Suite 500
> Salt Lake City, Utah
> I herby certify that this is a true copy of the
> official record on file in this office.
>
> Josh ___  6/10/2020
> Date

according to the Official Plat of the Survey of said Land, returned to the General Land Office by the Surveyor General.

**Now know ye** that there is, therefore, granted by the United States unto the said *Edward Meredith* the tract of Land above described: **To have and to hold** the said tract of Land, with the appurtenances thereof, unto the said *Edward Meredith* and to *his* heirs and assigns forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws, and decisions of courts, and also subject to the right of the proprietor of a vein or lode to extract and remove his ore therefrom, should the same be found to penetrate or intersect the premises hereby granted, as provided by law.

**In testimony whereof, I,** *Grover Cleveland*, PRESIDENT OF THE UNITED STATES OF AMERICA, have caused these letters to be made Patent, and the Seal of the General Land Office to be hereunto affixed.

**Given** under my hand, at the City of Washington, the *twenty sixth* day of *February* , in the year of our Lord one thousand eight hundred and *eighty seven* , and of the Independence of the United States the *one hundred and eleventh*

[L.S.]

**By the President:** *Grover Cleveland*

By *M McKean* , Secretary.

*Robt K Ross* , Recorder of the General Land Office.

ENT 52870:2020 PG 9 of 11



4/17/2020                                   www.utahcounty.gov/landrecords/property.asp?av_serial=470590003010



## PROPERTY INFORMATION

mobile view

**Serial Number:** 47:059:0003          **Serial Life:** 1981...

**Property Address:** 9870 MEADOW - CEDAR HILLS
**Mailing Address:** 886 E 490 N LINDON, UT 84042-1595
**Acreage:** 0.36
**Last Document:** 121145-2008
Subdivision Map Filing
**Legal Description:** LOT 3, PLAT C, AMEMDED NORTH MEADOW EST. SUB.



Total Photos: 2

| Owner Names | Value History | Tax History | Location | Photos | Documents | Aerial Image |
| --- | --- | --- | --- | --- | --- | --- |

| | |
| --- | --- |
| 2009... | CROMAR, BARBARA ANN |
| 2009... | CROMAR, PAUL KENNETH |
| 2000-2008 | STRATEGY HOLDINGS |
| 2000-2008 | WHITE, LANNY |
| 1999 | STRATEGY HOLDINGS |
| 1999 | WHITE, LANNY |
| 1996-1998 | ARAN ISLANDS HOLDINGS |
| 1992-1995 | CROMAR, BARBARA A |
| 1992-1995 | CROMAR, KEN |
| 1992NV | TAYLOR HOMES |
| 1988-1991 | NORTH MEADOW INCORPORATED |
| 1984-1987 | NORTH MEADOW INCORPORATED |
| 1981-1983 | NORTH MEADOW INC |

Abstract                          ▼

Main Menu

Comments or Concerns on Value/Appraisal - Assessor's Office          ENT   52870:2020 PG 11 of 11
Documents/Owner/Parcel Information - Recorder's Office
Address Change for Tax Notice

This page was created on 4/17/2020 4:58:50 PM



STATE OF UTAH
COUNTY OF UTAH
I THE UNDERSIGNED RECORDER OF UTAH COUNTY UTAH
DO HEREBY CERTIFY THAT THE AMENDED AND FOREGOING IS A
TRUE COPY OF THE ORIGINAL RECORDED DOCUMENT IN THE
OFFICE RECORD IN MY OFFICE AS THE SAME APPEARS IN
ENTRY 52370-2020 PAGES     11
BOOK_____ AT PAGE _____
WITNESS MY HAND AND SEAL OF SAID OFFICE THIS 7th
DAY OF April     20  21
ANDREA ALLEN RECORDER
                    DEPUTY

EXHIBIT B

MEMORANDUM OF LAW - History, Force & Effect of the Land Patent

# MEMORANDUM OF LAW

# HISTORY, FORCE & EFFECT OF THE LAND PATENT

By Ron Gibson / Constitutional Lawyer / Medford, Oregon

**SECTION I**

## ALLODIAL v. FEUDAL TITLES

This memorandum will be construed to comply with provisions necessary to establish presumed fact (Rule 301, Federal Rules of Evidence, and attending State rules) should interested parties fail to rebut any given allegation or matter of law addressed herein.  The position will be construed as adequate to meet requirements of judicial notice, thus preserving fundamental law. Matters addressed herein, if not rebutted, will be construed to have general application.

In America today, there is a phenomenon occurring that has not been experienced since the mid-1930's. That phenomenon is increasingly, rising number of foreclosures, both in the rural sector and in the cities. This phenomenon is occurring because of the inability of the debtor to pay the creditor the necessary interest and principle on a rising debt load that is expanding across the country. As a defense, the land patent or fee simple title to the land and the congressional intent that accompanies the patent is hereby being presented.  In order to properly evaluate the patent, in any given situation, it is necessary to understand what a patent is, why it was created, what existed before the patent, particularly in common-law England. These questions must be answered in order to effectively understand the association between the government, the land, and the people.

First, what existed before land patents?  Since it is imperative to understand what the land patent is and why it was created, the best method is a study of the converse, or the common-law English land titles.

This method thus allows us to fully understand what we are presently supposed to have by way of actual ownership of land.

In England, at least until the mid-1600's, and arguably until William Blackstone's time in the mid-1700's, property was exclusively owned by the King.  In arbitrary governments; the title is held by and springs from the supreme head, be he the emperor, king, potentate; or by whatever name he is known. McConnell v. Wilcox, I Seam (111.) 344, 367 (1837) The king was the true and complete owner, giving him the authority to take and grant the land from the people in his kingdom who either lost or gained his favor.  The authority to take the land may have required a

1

justifiable reason, but the king, leaving the disseised former holder of the land wondering what it was that had brought the King's wrath to bear upon him could conceivably have fabricated such a reason. At the same time the beneficiary of such a gift, while undoubtedly knowing the circumstances behind such a gift, may still not have known how the facts were discovered and not knowing how such facts occurred, may have been left to wonder if the same fate awaited him if ever he fell into disfavor with the king.

The King's gifts were called fiefs, a fief being the same as a feud, which is described as an estate in land held of a superior on condition of rendering him services. {2 Blackstone's Commentaries, p. 105.} It is also described as an inheritable right to the use and occupation of lands, held on condition of rendering services to the lord or proprietor, who himself retains the ownership in the lands, {Black's Law Dictionary, 4th Edition p. 748 (1968).} Thus, the people had land they occupied, devised, inherited, alienated, or disposed of as they saw fit, so long as they remained in favor with the King. {F. L. Ganshof, Feudalism, p. 113 (1964)}. "This holding of lands under another was called a tenure, and was not limited to the relation of the first or paramount lord and vassal. It extended to those to whom such vassal, within the rules of feudal law, may have parted out his own feud to his own vassals, whereby he became the mesne lord between his vassals and his own or lord paramount. Those who held directly to the king were called his "tenants in ... chief. " {I E. Washburn, Treatise on the American Law of Real Property, Ch. 11, Section 58, P. 42 (6th Ed. 1902).} In this manner, the lands, which had been granted to the barons principal lands were again subdivided, and granted by them to sub-feudatories to be held of themselves.

{Id., Section 65, p.44.} The size of the gift of the land could vary from a few acres to thousands of acres depending on the power and prestige of the lord. {See supra Ganshof at 113.} The fiefs were built in the same manner as a pyramid, with the King, the true owner of the land, being at the top, and from the bottom up there existed a system of small to medium sized to large to large sized estates on which the persons directly beneath one estate owed homage to the lord of that estate as well as to the King. {Id. At 114}

At the lowest level of this pyramid through at least the 14th and 15th centuries existed to serfs or villains, the class of people that had no rights and were recognized as nothing more than real property.

{F. Goodwin, Treatise on The Law of Real Property, Ch. 1, p. 10 (1905)} This system of hierarchical land holdings required an elaborate system of payment. These fiefs to the land might be recompenses in any number of ways.

One of the more common types of fiefs, or the payment of a rent or obligation to perform rural labor upon the lord's lands known as socage, was the crops field. {Id. at 8} Under this type of fief a certain portion of the grain harvested each year would immediately be turned over to the lord above that particular fief even before the shares from the lower lords and then serfs of the fief would be distributed.

A more interesting type of fief for purposes of this memorandum was the money fief. In most cases, the source of money was not specified, and the payment was simply made from the fief holder's treasury, but the fief might also consist of a fixed revenue to be paid from a definite

source in annual payments in order for the tenant owner of the fief to be able to remain on the property. {Gilsebert of Mons, Chronique, cc. 69 and 1 15, pp. 109, 175 ed. Vanderkindere)}

The title held by such tenant-owners over their land was described as a fee simple absolute. "Fee simple, Fee commeth of the French fief, i.e., praedium beneficiarium, and legally signifieth inheritance as our author himself hereafter expoundeth it and simple is added, for that it is descendible to his heirs generally, that is, simply, without restraint to the heirs of his body, or the like, *Feodum est quod quis tenet ex quacunque causa sive sit tenementum sive redditus*, etc. In Domesday it is called feudom."

{Littleton, Tenures, Sec. Ib, Fee Simple} In Section 11,fee simple is described as the largest form of inheritance. Id. In modern English tenures, the term fee signifies an inheritable estate, being the highest and most extensive interest the common man or noble, other than the King, could have in the feudal system. {2 Blackstone's Commentaries, p. 106}

Thus, the term fee simple absolute in common-law England denotes the most and best title a person could have as long as the King allowed him to retain possession of (own) the land. It has been commented that the basis of English land law is the ownership of all reality by the sovereign. From the crown, all titles flow. The original and true meaning of the word "fee" and therefore fee simple absolute is the same as fief or feud, this being in contradiction to the term "allodium" which means or is defined as a man's own land, which he possesses merely in his own right, without owing any rent or service to any superior. **Wendell v Crandall, 1 N. Y. 491 (1848)** Therefore on common-law England practically everybody who was allowed to retain land, had the type of fee simple absolute often used or defined by courts, a fee simple that grants or gives the occupier as much of a title as the "sovereign" allows such occupier to have at that time.

The term became a synonym with the supposed ownership of land under the feudal system of England at common law. Thus, even though the word absolute was attached to the fee simple, it merely denoted the entire estate that could be assigned or passed to heirs, and the fee being the operative word; fee simple absolute dealt with the entire fief and its divisibility, alienability and inheritability. **Friedman v Steiner, 107 Ill. 131 (1883)**. If a fee simple absolute in common-law England denoted or was synonymous with only as much title as the King allowed his barons to possess, then what did the King have by way of a title?

The King of England held ownership of land under a different title and with far greater powers than any of his subjects. Though the people of England held fee simple titles to their land, the King actually owned all the land in England through his allodial title, and though all the land was in the feudal system, none of the fee simple titles were of equal weight and dignity with the King's title, the land always remaining allodial in favor of the King. {Gilsbert of Mons, Chronique, Ch. 43, p. 75 (ed. Vanderkindere)}

Thus, it is relatively easy to deduce that allodial lands and titles are the highest form of lands and titles known to Common-Law. An estate of inheritance without condition, belonging to the owner, and alienable by him, transmissible to his heirs absolutely and simply, is an absolute estate in perpetuity and the largest possible estate a man can have, being in fact allodial in its

nature. **Stanton v Sullivan, 63 R.I. 216, 7 A. 696 (1839)** "The original meaning of a perpetuity is an inalienable, indestructible interest." Bovier's Law Dictionary, Volume 111, p. 2570 (1914)

The King had such a title in land. As such, during the classical feudalistic period of common-law England, the King answered to no one concerning the land. Allodial titles, being held by sovereigns, and being full and complete titles, allowed the King of England to own and control the entire country in the form of one large estate belonging to the Crown. Allodial estates owned by individuals exercising full and complete ownership, on the other hand, existed only to a limited extent in the County of Kent.

In summary of Common-Law England: the King was the only person (sovereign) to hold complete and full title to a land (allodial title); (2) the people who maintained estates of land, (either called manors or fiefs) held title by fee simple absolute; (3) this fee simple absolute provided the means by which the "supposed owner could devise, alienate, or pass by inheritance the estates of land (manors or fiefs); (4) this fee simple absolute in feudal England, being not the full title, did not protect the "owner" if the King found disfavor with the "owner", (5) the "owner" therefore had to pay a type of homage to the King or a higher baron each year to discharge the obligation of his fief, (6) this homage of his fief could take the form of a revenue or tax, an amount of grain, or a set and permanent amount of money, (7) and therefore as long as the "owner" of the fief in fee simple absolute paid homage to the king or sovereign, who held the entire country under an allodial title, then the "owner" could remain on the property with full rights to sell, devise or pass it by inheritance as if the property was really his.


## SECTION Il

## LAND OWNERSHIP IN AMERICA TODAY
## THE AMERICAN FEUDALISTIC SOCIETY

The private ownership of land in America is one of those rights people have proclaimed to be fundamental and essential in maintaining this republic. The necessary question in discussing this topic however is whether ownership of land in America today really is a true and complete ownership of land under an allodial concept, or is it something much different. In other words, are we living in an actual allodial freehold or are we living in an updated version of feudalistic Common Law.

The answer is crucial in determining what rights we have in the protection of our reality against improper seizures and encumbrances by our government and creditors. The answer appears to be extremely clear upon proper reflection of our rights when payments are missed on mortgages, or taxes, for whatever reason, are not paid. If mortgage payments are missed or taxes are not paid, we actually fall into disfavor with the parties who have the power, and these powers, through court proceedings or otherwise, take our land as a penalty. When one understands, when he is unable to perform as the government or his creditors request, and for such failures of performance his land can be forfeited, then he can begin to understand exactly what type of land-

ownership system controls his life, and he should recognize the inherent unjustness of such constitutional violations.

The American-based system of land ownership today consists of three key requirements. These three are the warranty deed or some other type of deed purporting to convey ownership of land, title abstracts to chronologically follow the development of these different types of deeds to a piece of property, and title insurance to protect the ownership of that land. These three ingredients must work together to ensure a systematic and orderly conveyance of a piece of property; none of these three by itself can act to completely convey possession of the land from one person to another. At least two of the three are always deemed necessary to adequately satisfy the legal system and real estate agents that the titles to the property had been placed in the hands of the purchaser.  Often-times, all three are necessary to properly pass the ownership of the land to the purchaser.  Yet does the absolute title and therefore the ownership of the land really pass from the seller to purchaser with the use of any one of these three instruments or in any combination thereof?  None of the three by itself passes the absolute or allodial title to the land, the system of land ownership America originally operated under, and even combined all three cannot convey this absolute type of ownership.

What then is the function of these three instruments that are used in land-conveyances and what type of title the three conveys? Since the abstract only traces the title and the title insurance only insures the title, the most important and therefore first group examined are the deeds that purportedly convey the fee from seller to purchaser.  These deeds include the ones as follows: warranty deed, quit claim deed, sheriffs deed, trustee's deed, judicial deed, tax deed, wig or any other instrument that purportedly conveys the title.  All of these documents state that it conveys the ownership to the land.  Each of these, however, is actually a color of title.

(G. Thompson, Title to Real Property, Preparation and Examination of Abstracts, Ch. 3, Section 73, p.93 (1919)

A color of title is that which in appearance is title, but which in reality is not title**. Wright v. Mattison, 18 How. (U.S.) 50 (1855)** In fact, any instrument may constitute color of title when it purports to convey the title of the land, as well the land itself, although it is void as a muniment of title. **Joplin Brewing Co. v. Payne, 197 No. 422, 94 S.W. 896 (1906)**

The Supreme Court of Missouri has stated, "¼that [when we say a person has a color of title, whatever may be the meaning of the phrase, we express the idea, at least, that some act has been previously done... by which some title, good or bad, to a parcel of land of definite extent had been conveyed to him." **St. Louis v. German, 29 Mo. 593 (1860)**   In other words, a color of title is an appearance or apparent title, and "image' of the true title, hence the phrase 'color of" which, when coupled with possession purports to convey the ownership of the land to the purchaser. This however does not say that the color of title is the actual and true title itself nor does it say that the color of title itself actually conveys ownership. In fact, the claimant or holder of a color of title is not even required to trace the title through the chain down to his instrument. **Rawson v. Fox, 65 111. 200 (1872)**

Rather it may be said that a color of title is prima facie evidence of ownership of and rights to possession of land until such time as that presumption of ownership is disproved by a better title or the actual title itself. If such cannot he proven to the contrary, then ownership of the land is assumed to have passed to occupier of the land. To further strengthen a color title-holder's position, courts have held that the good faith of the holder to a color of title is presumed in the absence of evidence to the contrary. **David v. Hall, 92 R. 1. 85 (1879)**; see also **Morrison v. Norman, 47 Ill. 477 (1868); and McConnell v. Street, 17 Ill. 253 (1855)** With such knowledge of what a color of title is, it is interesting what constitutes colors of title. A warranty deed is like any other deed of conveyance.

**Mahrenholz v. County Board of School Trustees of Lawrence County, et. al., 93 Ill. app. 3d 366 (1981)** A warranty deed or deed of conveyance is a color of title, as stated in **Dempsey v. Bums, 281 Ill. 644, 650 (1917)** (Deeds constitute colors of title); see also **Dryden v. Newman, 116 Ill. 186 (1886)** (A deed that purports to convey interest in the land is a color of title) **Hinckley v. Green 52 Ill. 223 (1869)** (A deed which, on its face, purports to convey a title, constitutes a claim and color of title); **Busch v. Huston, 75 Ill. 343 (1874); Chicking v. Failes, 26 Ill. 508 (1861)** A quit claim deed is a color of title as stated in **Safford v. Stubbs, 1 17 Ill. 389 [1886];** see also **Hooway v. Clark, 27 Ill. 483 (1861)** and **McCellan v. Kellogg, 17 Ill. 498 (1855)** Quit claim deeds can pass the title as effectively as a warrant with full covenants. **Grant v. Bennett, 96 Ill. 513, 525 (1880)** See also **Morgan v. Clayton, 61 Ill. 35 (1871); Brady v. Spurck, 27 Ill. 478 (1861); Butterfield v. Smith, Ill. 11 1. 485 (1849)** Sheriffs deeds also are colors of title. **Kendrick v. Latham, 25 Fla. 819 (1889)**; as is a judicial deed, **Huls v. Buntin, 47 Ill. 396 (1865)**. The Illinois Supreme Court went into detail in its determination that a tax deed is only color of title. There the complainant seem to have relied upon the tax deed as conveying to him the fee, and to sustain such a bill, it was incumbent of him to show that all the requirements of the law had been complied with."

A simple tax deed by itself is only a color of title. Fee simple can only be acquired though adverse possession via payment of taxes; claim and color of title, plus seven years of payment of taxes. Thus any tax deed purports, on its face, to convey title is a good color of title. **Walker v. Converse, 148 Ill. 622, 629 (1894)**; see also **Peadro v. Carriker, 168 Ill. 570 (1897); Chicago v. Middlebrooke, 143 Ill. 265 (1892); Piatt County v. Gooden, 97 Ill. 84 (1880); Stubblefield v. Borders, 92 Ill. 570 (1897); Coleman v. Billings, 89 Ill. 183 (1878); Whitney v. Stevens, 89 Ill. 53 (1878); Holloway v. Clarke, 27 Ill. 483 (1861),** color of title. **Baldwin v. Ratcliff, 125 Ill. 376 (1888); Bradley v. Rees, 113 Ill. 327 (1885)** (A wig can pass only so much as the testator owns, though it may attempt to pass more). A trustee's deed, a mortgages and strict foreclosure, **Chickering v. Failes, 26 Ill. 508, 519 (1861),** or any document defining the extent of a disseisor's claim or purported claim, **Cook v. Norton, 43 Ill. 391 (1867),** all have been held to be colors of title. In fact, If there is nothing here requiring a deed, to establish a color of title, and under the former decisions of this court, color or title may exist without a deed." **Baldwin v. Ratcliff, 125 Ill. 376, 383 (1882); County of Piatt v. Goodell, 97 Ill. 84 (1880); Smith v. Ferguson, 91 Ill. 304 (1878); Hassett v. Ridgely, 49 Ill. 197 (1868); Brooks v. Bruyn, 35 Ill. 392 (1864); McCagg v. Heacock, 34 Ill. 476 (1864); Bride v. Watt, 23 Ill. 507 (1860);** and **Woodward v. Blanchard, 16 Ill. 424 (1855)** All of these cases being still valid and none being overruled, in effect, the statements in these cases are well established law. All of the documents

described in these cases are the main avenues of claimed land ownership in America today, yet none actually conveys the true and allodial title. They in fact convey something quite different.

When it is stated that a color of title conveys only an appearance of or apparent title, such a statement is correct but perhaps too vague to be properly understood in its correct legal context.

What are useful are the more pragmatic statements concerning titles. A title or color of title, in order to be effective in transferring the ownership or purported ownership of the land, must be a marketable or merchantable title. A marketable or merchantable title is one that is reasonably free from doubt. **Austin v. Bamum, 52 Minn. 136 (1892)**. This title must be as reasonably free from doubts as necessary to not affect the marketability or salability of the property, and must be a title a reasonably prudent person would be willing to accept. **Robert v. McFadden, 32 Tex-Civ.App. 471 74 S.W. 105 (1903)**. Such a title is often described as one, which would ensure to the purchaser a peaceful enjoyment of the property, **Barnard v. Brown, 112 Mich. 452, 70 N.W. 1038 (1897)**, and it is stated that such a title must be obvious, evident, apparent, certain, sure or indubitable. **Ormsby v. Graham, 123 La. 202, 98 N.W. 724 (1904)**. Marketable Title Acts, which have been adopted in several of the states, generally do not lend themselves to an interpretation that they might operate to provide a new foundation of title based upon a stray, accidental, or interloping conveyance. Their object is to provide, for the recorded fee simple ownership, an exemption from the burdens of old conditions which at each transfer of the property interferes with its marketability. **Wichelman v. Messner, 83 N.W. 2d 800 (1957)** What each of these legal statements in the various factual situations says is that the color of title is never described as the absolute or actual title, rather each says that it is one of the types of titles necessary to convey ownership or apparent ownership.

A marketable title, what a color of title must be in order to be effective, must be a title which is good of recent record, even if it may not be the actual title in fact. **Close v. Stuyvesant, 132 Ill. 607, 24 N.E. 868 (1890)** "Authorities hold that to render a title marketable it is only necessary that it shall be free from reasonable doubt; in other words, that a purchaser is not entitled to demand a title absolutely free from every possible suspicion." **Cummings v. Dolan, 52 Wash. 496, 100 P. 989 (1909)** The record being spoken of here is the title abstract and all documentary evidence pertaining to it. "It is an axiom of hornbook law that a purchaser has notice only of recorded instruments that are within his 'chain of title'."

I R. Patton & C. Patton, Patton on Land Title, Section 69, at 230-233. (2nd ed. 1957); **Sabo v. Horvath, 559 P. 2d 1038, 1043 (Ak.1976)**. Title insurance then guarantees that a title is marketable, not absolutely free from doubt.

Thus, under the color or title system used most often in this country today, no individual operating under this type of title system has the absolute or allodial title. All that is really necessary to have a valid title is to have a relatively clean abstract with a recognizable color of title as the operative marketable title within the chain of title. It therefore becomes necessarily difficult, if not impossible after a number of years, considering the inevitable contingencies that must arise and the title disputes that will occur, to ever properly guarantee an absolute title. This is not necessarily the fault of the seller, but it is the fault of the legal and real estate systems for allowing such a diluted form of title to be controlling in an area where it is imperative to have the

absolute title. In order to correct this problem, it is important to return to those documents the early leaders or the nation created to properly ensure that property remained one of the inalienable rights that the newly established sovereign freeholders could rely on to always exist.

This correction must be in the form of restricting or perhaps eliminating the widespread use of a marketable title and returning to the absolute title.

Other problems have developed because of the use of a color of title system for the conveyance of land.

These problems arise in the area of terminology that succeed in only confusing and clouding the title to an even greater extent than merely using terms like marketability, salability or merchantability. When a person must also determine whether a title is complete, perfect, good and clear, or whether it Is a bad, defective, imperfect and doubtful, there is any obvious possibility of destroying a chain of title because of an inability to recognize what is acceptable to a reasonable purchaser.

A complete title means that a person has the possession, right of possession and the right of property. **Dingey v. Paxton, 60 Miss. 1038 (1883)** and **Ehle v. Quackenboss, 6 Hill (N.Y.) 537 (1844)**  A perfect title is exactly the same as a complete title, **Donovan v. Pitcher, 53 Ala. 411 (1875)** and  **Converse v. Kellogg, 7 Barb. (N. Y.) 590 (1850);** and each simply means the type of title a well-informed, reasonable and prudent person would be willing to accept when paying full value for the property. **Birge v. Beck, 44 Mo. App. 69 (1890)**.  In other words, a complete or perfect title is in reality a marketable or merchantable title, and is usually represented by a color of title.

A good title does not necessarily mean one perfect of record but consists of one which is both of rightful ownership and rightful possession of the property **Bloch v. Ryan, 4 App. Cas 283 (1894)**.  It means a title free from litigation, palpable defects and grave doubts consisting of both legal and equitable titles and fairly deducible of record. **Reynolds v. Borel, 86 Cal. 538, 25 P. 67 (1890)**.  "A good title means not merely a title valid in fact, but a marketable title, which can again be sold to a reasonable purchaser or mortgaged to a person of reasonable prudence as security for a loan of money." **Moore v. Williams, 115 N.Y. 586, 22 N.E. 253 (1889)**  A clear title means there are no encumbrances on the land, **Roberts v. Bassett, 105 Mass. 409 (1870)**  Thus, when contracting to convey land, the use of the phrase "good and clear title" is surplusage, since the terms good title and clear title are in fact synonymous. **Oakley v. Cook, 41 N.J. Eq. 350, 7 A.2d 495 (1886)**  Therefore, the words good title and clear title, just like the words complete title and perfect title, describe nothing more than a marketable title or merchantable title, and as stated above, each can and almost always is represented in a transaction by a color of title. None of these types of title purports to be the absolute, or allodial title, and none of them are that type of title. None of these actually claims to be a fee simple absolute, and since these types of titles are almost always represented by a color of title, none represents that it passes the actual title. Each one does state that it passes what can be described as a title good enough to avoid the necessity of litigation to determine who actually has the title.  If such litigation to determine titles is necessary, then the title has crossed the boundaries of usefulness and entered a different category of title descriptions and names.

8

This new category consists of titles, which are bad, defective, imperfect or doubtful. A bad title conveys no property to the purchaser of the estates. **Heller v. Cohen, 15 Misc. 378, 36 N.Y.S. 668 (1895)**. A title is defective when the party claiming to own the land has not the whole title, but some other person has title to a part or portion of it. Such a title is the same as no title whatsoever. **Place v. People, 192 Ill. 160, 61 N.E. (1901)**; See also **Cospertini v. Oppermann, 76 Cal. 181, 18 P. 256 (1888)** imperfect title is one where something remains to be done by the granting power to pass the title to the land, **Raschel v. Perez, 7 Tex. 348 (1851)**; and a doubtful title is also one which conveys no property to the purchaser of the estate. **Heller v. Cohen, 15 Misc. 378, 36 N.Y.S. 668 (1895)**. Every title is described as doubtful which invites or exposes the party holding it to litigation. **Herman v. Somers, 158 PA.ST. 424, 27 A. 1050 (1893)** Each of these types of titles describes exactly the same idea stated in many different ways, that because of some problem, defect, or question surrounding the title, no title can be conveyed, since no title exists. Yet in all of these situations some type of color of title was used as the operative instrument. What then makes one color of title complete, good or clear in one situation, and in another situation the same type of color of title could be described as bad, defective, imperfect or doubtful?

What is necessary to make what might otherwise be a doubtful title, a good title, is the belief of others in the community, whether or not properly justified, that the title is a good one which they would be willing to purchase. **Moore v. Williams, 115 N.Y. 586, 22 N.E. 253 (1889)** The methods presently used to determine whether a title or color of title is good enough to not be doubtful, are the other two-thirds of the three possible requirements for the conveyance of a good or complete (marketable) title.

These two methods of properly ensuring that a title is a good or complete title are title abstracts, the complete documentary evidence of title, and title insurance. The legal title to land, based on a color of title, is made up of a series of documents required to be executed with the solemnities prescribed by law, and of facts not evidenced by documents, which show the claimant a person to whom the law gives the estate. Documentary evidences of title consist of voluntary grants by the sovereign, deeds of conveyances and wills by individuals, conveyances by statutory or judicial permission, deeds made in connection with the sale of land for delinquent taxes, proceedings under the power of eminent domain, and deeds executed by ministerial or fiduciary officers. These documentary evidences are represented by the land patent and the colors of title. {I G. Thompson, Commentaries on the Modem Law of Real Property, pp. 99-100 (5th ed. 1980)}

These instruments, relied upon to evidence the title, coupled with the outward assertive acts that import dominion, must be used by the abstractor in compiling the abstract, and the attorney must examine to determine the true status of the title. The abstract is the recorded history of the land and the various types of titles, mortgages and other liens, claims and interests that have been placed on the property. The abstract can determine the number of times the patent has been re-declared, who owns the mineral rights, what color of title is operable at any particular point in time, and what lien holder is in first position, but it does not convey or even attempt to convey any form of the title itself. As Thompson, supra has stated, it is necessary when operating with colors of titles to have an abstract to determine the status of the operable title and determine

whether that title is good or doubtful. If the title is deemed good after this lengthy process, then the property may be transferred without doing anything more, since it is assumed that the seller was the owner of the property. This is not to say emphatically that the seller is the paramount or absolute owner. This does not even completely guarantee that he is the owner of the land against any adverse claimants. It is not even that difficult to claim that the title holder has a good title due to the leniency and attitude now evidenced by the judicial authorities toward maintaining a stable and uniform system of land ownership, whether or not that ownership is justified. This however, does not explain the purpose and goal of a title abstract.

An abstract that has been properly brought up simply states that it is presumed the seller is the owner of the land, making the title marketable, and guaranteeing that he has a good title to sell. This is all an abstract can legally do since it is not the title itself and it does not state the owner has an absolute title.

Therefore, the abstract cannot guarantee unquestionably that the title is held by the owner. All of this rhetoric is necessary if the title is good; if there is some question concerning the title without making it defective, then the owner must turn to the last of the three alternatives to help pass a good title, title insurance. {G. Thompson, Title to Real Property, Preparation and Examination of Abstracts, Ch.111, Section 79r PP· 99-100 (1919)}

Title insurance is issued by title insurance companies to ensure the validity of the title against any defects, against any encumbrances affecting the designated property, and to protect the purchaser against any losses he sustains from the subsequent determination that his title is actually un-marketable.  Title insurance extends to any defects of title. It protects against the existence of any encumbrances, provided only that any judgments adverse to the title shall be pronounced by a court of competent jurisdiction.

It is not even necessary that a defect actually exist when the insurance policy was issued, it is simply necessary that there exists at the time of issuance of the policy and inchoate or potential defect which is rendered operative and substantial by the happening of some subsequent event. Since all one normally has is a color of title, the longer a title traverses history, the greater the possibility that the title will become defective. The greater the need for insurance simply to keep the title marketable, the easier it is to determine that the title possessed is not the true, paramount and absolute title. If a person had the paramount title, there would be no need for title insurance, though an abstract might be useful for record keeping and historical purposes. Title insurance and abstract record keeping are useful, primarily because of extensive reliance on colors of title, as the operative title for a piece of property.

This then supplies the necessary information concerning colors of title, title abstracts, and title insurance. This does not describe the relationship between the landowner and the government.

As was stated in the instruction, in feudal England, the King has the power, right and authority to take a person's land away from him, if and when the King felt it necessary. The question is whether most of the American system of land ownership and titles is in reality any different and whether therefore the American-based system of ownership, is in reality nothing more than a feudal system of land ownership.

Land ownership in America presently is founded on colors of title, and though people believe they are the complete and total owners of their property; under a color of title system this is far from the truth.

When people state that they are free and own their land, they in fact own it exactly to the extent the English barons owned their land in common-law England. They own their land so long as some "sovereign", the government or a creditor, states that they can own their land.  If one recalls from the beginning of this memorandum, it was states that if the King felt it justified, he could take the land from one person and give such land to another prospective baron.  Today, in American color-of-title Property law, if the landowner does not pay income tax, estate tax, property tax, mortgages or even a security note on personal property, then the "sovereign", the government or the creditor can justify the taking of the property and the sale of that same property to another prospective "baron", while leaving the owner with only limited defenses to such actions.

The only real difference between this and common-law England is that now others besides the King can profit from the unwillingness or inability of the "landower" to perform the socage or tenure required of every landowner of America.  As such no one is completely safe or protected on his property; no one can afford to make one mistake or the consequences will be forfeiture of the property.

If this were what the people in the mid 1700's wanted, there would have been no need to have an American Revolution, since the taxes were secondary to having a sound monetary system and complete ownership of the land. Why fight a Revolutionary War to escape sovereign control and virtual dictatorship over the land, when in the 1990's these exact problems are prevalent with this one exception, money now changes hands in order to give validity to the eventual and continuous takeover of the property between the parties. This is hardly what the forefathers planned for when creating the United States Constitution, and what they did strive for is the next segment of the memorandum of law, allodial ownership of the land via the land patent. The next segment will analyze the history of this type of title so that the patent can be properly understood, making it possible to comprehend the patent's true role in property law today.


# SECTION Ill

## LAND PATENTS AND WHY THEY WERE CREATED

As was seen in the previous sections, there is little to protect the landowner who holds title in the chain of title, when distressful economic or weather condition make it impossible to perform on the debt. Under the color-of-title system, the property, "one of those inalienable rights", can be taken for the nonperformance on loan obligations. This type of ownership is similar to the feudal ownership found in the Middle Ages.

11

Upon defeating the English in 1066 A.D., William the Conqueror pursuant to his 52nd and 58th laws, "...effectually reduced the lands of England to feuds, which were declared to be inheritable and from that time the maxim prevailed there that all lands in England are held from the King, and that all proceeded from his bounty. {I.E. Washburn, Treatise on The American Land of Real Property, Section 65, p.44 (6th ed. 1902)}

All lands in Europe, prior to the creation of the feudal system in France and Germany, were allodial. Most of these lands were voluntarily changed to feudal lands as protection from the neighboring barons or chieftains. Since no documents protected one's freedom over his land, once the lands were pledged for protection, the lands were lost forever. This was not the case in England.

England never voluntarily relinquished its land to William I. In fact were it not for a tactical error by King Harold II men in the Battle of Hastings, England might never have become feudal. A large proportion of the Saxon lands prior to the Conquest of A.D. 1066, were held as allodial, that is, by an absolute ownership, without recognizing any superior to whom any duty was due on account thereof.

The mode of conveying these allodial lands was most commonly done by a writing or charter, called a land-boc, or land allodial charter, which, for safekeeping between conveyances, was generally deposited in the monasteries. In fact, one portion of England, the County of Kent, was allowed to retain this form of land ownership while the rest of England became feudal. Therefore, when William I established feudalism in England to maintain control over his barons, such control created animosity over the next 2 centuries. {F.L. Ganshof, Feudalism, P. 114 (1964)}

As a result of such dictatorial control, some 25 barons joined forces to exert pressure on the then ruling monarch, King John, to gain some rights not all of which the common man would possess.

The result of this pressure at Runnymede became known as the Magna Carta. The Magna Carta was the basis of modern common law, the common law being a series of judicial decisions and royal decrees interpreting and following that document. The Magna Carta protected the basic rights, the rights that gave all people more freedom and power. The rights that would slowly erode.

Among these rights was a particular section dealing with ownership of the land. The barons still recognized the king as the lord paramount, but the barons wanted some of the rights their ancestors had prior to A.D. 1066. {F. Goodwin, Treatise on The Law of Real Property, Ch. 1, p.3 (1905)} Under this theory, the barons would have several rights and powers over the land, as the visible owners, that had not existed in England for 150 years. The particular section of most importance was Section 62 giving the most powerful barons letters of patent, raising their land ownership close to the level found in the County of Kent. Other sections, i.e., 10, 11, 26, 27, 37, 43, 52, 56, 57, and 61 were written to protect the right to "own" property, to illustrate how debts affected this fight to own property, and to secure the return of property that was unjustly taken. All these paragraphs were written with the single goal of protecting the "landowner" and helping him retain possession of his land, acquired in the service of the King, from unjust seizures or

improper debts. The barons attempted these goals with the intention of securing property to Pass to their heirs.

Unfortunately, goals are often not attained. Having re-pledged their loyalty to King John, the barons quickly disbanded their armies. King John died in 1216, one year after signing the Magna Carta. The new king did not wish to grant such privileges found in that document. Finally, the barons who forced the signing of the Magna Carta died, and with them went the driving force that created this great charter. The Magna Carta may have still been alive, but the new kings had no armies at their door forcing them to follow policies, and the charter was to a great extent forced to lie dormant. The barons who received the letters of patent, as well as other landholders perhaps should have enforced their rights, but their heirs were not in a position to do so and eventually the fights contained in the charter were forgotten.

Increasingly until the mid-1600's, the king's power waxed, abruptly ending with the execution of Charles I in 1649. By then however, the original intent of the Magna Carta was in part lost and the descendants of the original barons never required property protected, free land ownership. To this day, the freehold lands in England are still held to a great extent upon the feudal tenures. This lack of complete ownership in the land, as well as the most publicized search for religious freedom, drove the more adventurous Europeans to the Americas to be away from these restrictions.

The American colonists however soon adopted many of the same land concepts used in the old-world.

The kings of Europe had the authority to still exert influence, and the American version of barons sought to retain large tracts of land. As an example, the first patent granted in New York went to Killian Van Rensselaer dated in 1630 and confirmed in 1685 and 1704. {A. Getman, Title to Real Property, Principles and Sources of Titles – Compensation For Lands and Waters, Part Ill, Ch. 17, p.229 (1921)} The colonial charters of these American colonies, granted by the king of England, had references to the lands in the County of Kent, effectively denying the more barbaric aspects of feudalism from ever entering the continent, but feudalism with its tenures did exist for some time.

"It may be said that, at an early date, feudal tenures existed in this country to a limited extent." {C. Tiedeman, An Elementary Treatise on the American Law of Real Property, Ch· 11.} {The Principles of the Feudal System, Section 25, p.22 (2nd ed. 1892).} The result was a newly created form of feudal land ownership in America. As such, the feudal barons in the colonies could dictate who farmed their land, how their land was to be divided, and to a certain extent to whom the land should pass. But, just as the original barons discovered, this power was premised in part of the performance of duties for the king.

Upon the failure of performance, the king could order the Grant revoked, and Grant the land to another willing to acquiesce to the king's authority. This authority, however, was premised on the belief that people, recently arrived and relatively independent, would follow the authority of a king based 3000 miles away. Such a premise was ill founded.

13

The colonists came to America to avoid taxation without representation, to avoid persecution of religious freedom, and to acquire a small tract of land that could be owned completely. When the colonists were forced to pay taxes and were required to allow their homes to be occupied by soldiers; they revolted, fighting the British, and declaring their Declaration of Independence.

The Supreme Court of the United States reflected on this in **Chisholm v. Georgia, 2 Dall. (U.S.) 419 (1793),** stating: "...the revolution or rather the Declaration of Independence, found the people already united for general purposes, and at the same time, providing for their more domestic concerns, by state conventions, and other temporary arrangements. From the crown of Great Britain, the sovereignty of their country passed to the people of it; and it was then not an uncommon opinion, that the un-appropriated lands, which belonged to that crown, passed, not to the people of the colony or states within those limits they were situated, but to the whole people;... "We the people of the United States, do ordain and establish this constitution." Here we see the people acting as sovereigns of the whole country; and in the language of sovereignty, establishing a constitution by which it was their will, that the state governments, should be bound, and to which the state constitutions should be made to conform. It will be sufficient to observe briefly, that the sovereignties in Europe, and particularly in England, exist on feudal principles.

That system considers the prince as the sovereign, and the people his subjects; it regards his person as the object of allegiance, and excludes the idea of his being on an equal footing with a subject, either in a court of justice or elsewhere. That system contemplates him as being the fountain of honor and authority; and from his grace and grant, derives all franchises, immunities and privileges; it is easy to perceive, that such a sovereign could not be amenable to a court of justice, or subjected to judicial control and actual constraint. The same feudal ideas run through all their jurisprudence, and constantly remind us of the distinction between the prince and the subject.

No such ideas obtain here; at the revolution, the sovereignty devolved on the people; and they are truly the sovereigns of the country, but they are sovereigns without subjects and have none to govern but themselves; the citizens of America are equal as fellow-citizens, and as joint tenants in the sovereignty. From the differences existing between feudal sovereignties and governments founded on compacts, it necessarily follows, that their respective prerogatives must differ.

Sovereignty is the fight to govern; a nation or state sovereign is the person or persons in whom that resides. In Europe, the sovereignty is generally ascribed to the prince; here it rests' with the people; there the sovereign actually administers the government; here never in a single instance; our governors are the agents of the people, and at most stand in the same relation to their sovereign, in which the regents of Europe stand to their sovereigns. Their princes have personal powers, dignities, and preeminence, our rules have none but official; nor do they partake in the sovereignty otherwise, or in any other capacity, than as private citizens."

The Americans had a choice as to how they wanted their new government and country to be formed. Having broken away from the English sovereignty and establishing themselves as their own sovereigns, they had their choice of types of taxation, freedom of religion, and most importantly ownership of land. The American founding fathers chose allodial ownership of land

for the system of ownership on this country. In the opinion of Judge Kent, the question of tenure as an incident to the ownership of lands "has become wholly immaterial in this country, where every vestige of tenure has been annihilated." At the present day there is little, if any, trace of the feudal tenures remaining in the American law of property. Lands in this country are now held to be absolutely allodial.

Upon the completion of the Revolutionary War, lands in the thirteen colonies were held under a different form of land ownership. As stated in re Waltz et. al., **Barlow v. Security Trust & Savings Bank, 240 p. 19 (1925),** quoting **Matthews v. Ward, 10 Gill & J. (Md.) 443 (1839),** "after the American Revolution, lands in this state (Maryland) became allodial, subject to no tenure, nor to any services incident thereto."

The tenure, as you will recall, was the feudal tenure and the services or taxes required to be paid to retain possession of the land under the feudal system. This new type of ownership was acquired in all thirteen states. **Wallace v. Harmstead, 44 Pa. 492 (1863)** The American people, before developing a properly functioning stable government, developed a stable system of land ownership, whereby the people owned their land absolutely and in a manner similar to the king in common-law England. As has been stated earlier, the original and true meaning of the word "fee" and therefore fee simple absolute is the same as fief or feud, this being in contradistinction to the term "allodium" which means or is defined as man's own land, which he possesses merely in his own right, without owing any rent or service to any superior. **Wendell v. Crandall, 1 N. Y. 491 (1848)** [27] Stated another way, the fee simple estate of early England was never considered as absolute, as were lands in allodium, but were subject to some superior on condition of rendering him services, and in which the such superior had the ultimate ownership of the land. In re Waltz, at page 20, quoting I Cooley's Blackstone, (4th ed.) p. 512. This type of fee simple is a Common-Law term and sometimes corresponds to what in civil law is a perfect title. **United States v. Sunset Cemetery Co., 132 F. 2d 163 (1943).**

It is unquestioned that the king held an allodial title which was different than the Common-Law fee simple absolute. This type of superior title was bestowed upon the newly established American people by the founding fathers. The people were sovereigns by choice, and through this new type of land ownership, the people were sovereign freeholders or kings over their own land, beholden to no lord or superior. As stated in **Stanton v. Sullivan, 7 A· 696 (1839),** such an estate is an absolute estate in perpetuity and the largest possible estate a man can have, being, In fact allodial in its nature. This type of fee simple, as thus developed, has definite characteristics: (1) it is a present estate in land that is of indefinite duration; (2) it is freely alienable; (3) it carries with it the right of possession; and most importantly (4) the holder may make use of any portion of the freehold without being beholden to any person. {I G. Thompson, Commentaries on the Modern Law of Real Property, Section 1856, p. 412 (1st ed. 1924)}.

This fee simple estate means an absolute estate in lands wholly unqualmed by any reservation, reversion, condition or limitation, or possibility of any such thing present or future, precedent or subsequent. Id.; **Wichel'man v. Messner, 83 N.W. 2d 800, 806 (1957)** It is the most extensive estate and interest one may possess in real property. Where an estate subject to an option is not in fee. In the case, **Bradford v. Martin, [28] 201 N.W. 574 (1925),** the Iowa Supreme Court went into a lengthy discussion on what the terms fee simple and allodium means in American property

law. The Court stated: " The word "absolutely" in law has a varied meaning, but when unqualifiedly used with reference to titles or interest in land, its meaning is fairly well settled.

Originally the two titles most discussed were "fee simple" and "allodium" (which meant absolute) See Bouvier's. Law Dictionary. (Rawle Ed.) 134; **Wallace v. Harmstead, 44 Pa. 492**; **McCartee v. Orphan's Asylum, 9 Cow. (N.Y.) 437, 18 Am. Dec. 516.**

Prior to Blackstone's time the allodial title was ordinarily called an "absolute title" and was superior to a "fee simple title," the latter being encumbered with feudal clogs which were laid upon the first feudatory when it was granted, making it possible for the holder of a fee-simple title to lose his land in the event he failed to observe his feudatory oath. The allodial title was not so encumbered. Later the term "fee simple," however rose to the dignity of the allodial or absolute estate, and since the days of Blackstone the words of "absolute" and "fee Simple" seem to have been generally used interchangeably; in fact, he so uses them.

The basis of English rand law is the ownership of the realty by the sovereign, from the crown all titles flow. **People v. Richardson, 269 M. 275, 109 N.E. 1033 (1914); see also Matthew v. Ward, 10 Gill & J (Md.) 443 (1844)** The case, **McConnell v. Wilcox, I Seam. (IR.) 344 (1837),** stated it this way: "From what source does the title to the land derived from a government spring? In arbitrary governments, from the supreme head be he the emperor, king, or potentate; or by whatever name he is known. In a republic, from the law, making or authorizing to be made the grant or sale. In the first case, the party looks alone to his letters patent; in the second, to the law and the evidence of the acts necessary to be done under the law, to a perfection of his grant, donation or purchase The law alone must be the fountain from whence the authority is drawn; and there can be no other source."

The American people, newly established sovereigns in this republic after the victory achieved during the Revolutionary War, became complete owners in their land, beholden to no lord or superior; sovereign freeholders in the land themselves. These freeholders in the original thirteen states now held allodial the land they possessed before the war only feudally. This new and more powerful title protected the sovereigns from unwarranted intrusions or attempted takings of their land, and more importantly it secured in them a right to own land absolutely in perpetuity. By definition, the word perpetuity means, "Continuing forever. Legally, pertaining to real property, any condition extending the inalienability···" Black's Law Dictionary, P·1027 (5th ed. 1980)

In terms of an allodial title, it is to have the property of in-alienability forever. Nothing more need be done to establish the ownership of the sovereigns to their land, although confirmations were usually required to avoid possible future title confrontations. The states, even prior to the creation of our present Constitutional government, were issuing titles to the unoccupied lands within their boundaries. In New York, even before the war was won, the state issued the first land patent in 1781, and only a few weeks, after the battle and victory at Yorktown in 1783, the state issued the first land patent to an individual. In fact, even before the United States was created, New York and other states had developed their own Land Offices with Commissioners.

New York was first established in 1784 and was revised in 1786 to further provide for a more definite procedure for the sale of unappropriated State Lands. Id. The state courts held, "The

16

validity of letters patent and the effectiveness to convey title depends on the proper execution and record generally been the law that public grants to be valid must be recorded. The record is not for purposes of notice under recording acts but to make the transfer effectual." Later, if there was deemed to be a problem with the title, the state grants could be confirmed by issuance of a confirmatory grant. This then, in part, explains the methods and techniques the original states used to pass title to their lands, lands that remained in the possession of the state unless Purchased by the still yet uncreated federal government, or by individuals in the respective states. Too much this same extent Texas, having been a separate country and republic, controlled and still controls its lands. In each of these instances, the land was not originally owned by the federal government and then later passed to the people and states. This then is a synopsis of the transition from colony to statehood and the rights to land ownership under each situation. This however has said nothing of the methods used by the states in the creation of the federal government and the eventual disposal of the federal lands.

The Constitution in its original form was ratified by a convention of the States, on September 17, 1787.

The Constitution and the government formed under it were declared in effect on the first Wednesday of March 1789. Prior to this time, during the Constitutional Convention, there was serious debate on the disposal of what the convention called the "Western Territories," now the states of Ohio, Indiana, Illinois, Michigan, Wisconsin and part of Minnesota, more commonly known as the Northwest Territory. This tract of land was ceded to the new American republic in the treaty signed with Britain in 1783.

The attempts to determine how such a disposal of the Western territories should come about was the subject of much discussion in the records of the Continental Congress. Beginning in September 1783, there was continual discussion concerning the acquisition of and later disposition to the lands east of the Mississippi River. Journals of Congress, Papers of the Continental Congress, No. 25, 11, folio 255, p. 544-557 (September 13, 1783) "¼and whereas the United States have succeeded to the sovereignty over the Western territory, and are thereby vested as one undivided and independent nation, with all and every power and right exercised by the king of Great Britain, over the said territory, or the lands lying and situated without the boundaries of the several states, and within the limits above described; and whereas the western territory ceded by France and Spain to Great Britain, relinquished to the United States by Great Britain, and guarantied to the United States by France as aforesaid, if properly managed, will enable the United States to comply with their promises of land to their officers and soldiers; will relieve their citizens from much of the weight of taxation;.... and if cast into new states, will tend to increase the happiness of mankind, by rendering the purchase of land easy, and the possession of liberty permanent; therefore Resolved, that a committee be appointed to report the territory lying without the boundaries of the several states; ... ; and also to report an establishment for a land office."

There was also serious discussion and later acquisition by the then technically nonexistent federal government of land originally held by the colonial governments. As the years progressed, the goal remained the same, a proper determination of a simple method of disposing of the western lands. "That an advantageous disposition of the western territory is an object worthy the

deliberation of Congress." Id. February 14, 1786, at p. 68. In February 1787, the Continental Congress continued to hold discussions on how to dispose of all western territories. As part of the basis for such disposal, it was determined to divide the new northwestern territories into medians, ranges, townships, and sections, making for easy division of the land, and giving the new owners of such land a certain number of acres in fee. Journals of Congress, p. 21, February 1787, and Committee Book, Papers of the Continental Congress, No. 190, p. 132 (1788)

In September of that same year, there were most discussions on the methods of disposing the land. In those discussions, there were debates in the validity and solemnity of the state patents that has been issued in the past. Only a week earlier the Constitution was ratified by the conventions of the states.

Finally, the future Senate and House of Representatives, though not officially a government for another one and a half years, held discussions on the possible creation of documents that would pass the title of lands from the new government to the people. In these discussions, the first patents were created and ratified, making the old land-boc, or land-allodial charters of the Saxon nobles, 750 years earlier, and the letters patent of the Magna Carta, guidelines by which the land would pass to the sovereign freeholders of America. Id., July 2, 1788, pp.77-286.

As part of the method by which the new United States decided to dispose of its territories, it created in the Constitution an article, section, and clause, that specifically dealt with such disposal. Article IV, Section 111, Clause 11, states in part, "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other property belonging to the United States. " Thus, Congress was given the power to create a vehicle to divest the Federal Government of all its right and interest in the land. This vehicle, known as the land patent, was to forever divest the federal government of its land and was to place such total ownership in the hands of the sovereign freeholders who collectively created the government. *The land patents issued prior to the initial date of recognition of the United States Constitution were ratified by the members of Constitutional Congress.* Those Patents created by statute after March 1789, had only the power of the statutes and the Congressional intent behind such statutes as a reference and basis for the determination of their powers and operational effect originally and in the American system of land ownership today.

There have been dozens of statutes enacted pursuant to Article IV, Section 111, Clause 11. Some of these statutes had very specific intents of aiding soldiers of wars, or dividing lands in a very small region of one state, but all had the main goal of creating in the sovereigns, freeholders on their lands, beholden to no lord or superior. Some of the statutes include, 12 Stat 392, 37th Congress, Sess. 11, Ch. 75, (1862) (the Homestead Act); 9 Stat. 520, 3 Ist Congress, Sess. 1, Ch. 85 (1850) Military Bounty Service Act); 8 Stat. 123, 29th Congress, Sess. 11 Ch. 8, (1847) (Act to raise additional military force and for other purposes); 5 Stat 444, 21st Congress, Sess. 11, Ch. 30 (1831); 4 Stat 51, 18th Congress, Sess. I.,Ch. 174 (1824); 5 Stat 52, 18th Congress, Sess. 1, Ch. 173 (1824); 5 Stat 56, 18th Congress, Sess. 1, Ch. 172, (1824); 3 Stat. 566, 16th Congress, Sess. 1, Ch. 51, (1820) (the major land patent statute enacted to dispose of lands); 2 Stat 748, 12th Congress, Sess. 1. Ch. 99 (1812); 2 Stat. 728, 12th Congress, Sess. 1, Ch. 77, (1812); 2 Stat. 716, 12th Congress, Sess. 1, Ch. 68, (1812) (the act establishing the General Land-Office in the Department of Treasury); 2 Stat 590, Ilth Congress, Sess. U, Ch. 3.5,(1810);2 Stat 437, 9th

Congress, Sess. H, Ch. 34, (1807); and 2 Stat 437, 9th Congress, Sess. H, Ch. 31, (1807) These, of course, are only a few of the statutes of enacted to dispose of public lands to the sovereigns.

One of these acts however, was the main patent statute in reference to the intent Congress had when creating the patents. That status is 3 Stat 566, In order to understand the validity of a patent, in today's property law, it is necessary to turn to other sources than the acts themselves. These sources include the congressional debates and case law citing such debates. For the best answer to this question, it is necessary to turn to the Abridgment of the Debates of Congress, Monday, March 6, 1820, in the Senate, considering the topic "The Public Lands."

This abridgment and the actual debates found in its concern one of the most important of the land patent statutes, 3 Stat 566, 16th Congress, Sess. 1. Ch. 51, Stat. 1, (April 24, 1820)

In this important debate, the reason for such a particular act in general and the protection afforded by the patent in particular were discussed. As Senator Edwards states;  it is not my purpose to discuss, at length, the merits of the proposed change. I will, at present, content myself with an effort, merely, to shield the present settlers upon public lands from merciless speculators, whose cupidity and avarice would unquestionably be tempted by the improvements which those settlers have made with the sweat of their brows, and to which they have been encouraged by the conduct of the government itself, for though they might be considered as embraced by the letter of the law which provides against intrusion on public lands, yet, that their case has not been considered by the Government as within the mischief's intended to be prevented is manifest, not only from the forbearance to enforce the law, but from the positive rewards which others, in their situation, have received, by the several laws which have heretofore been granted to them by the same right if preemption which I now wish extended to the present settlers." Further, Senator King from New York stated, he considered the change as highly favorable to the poor man; and he argued at some length, that it was calculated to plant in the new country a population of independent, unembarrassed freeholders; that it would cut up speculation and monopoly; that the money paid for the lands would be carried from the State or country from which the purchaser should remove; that it would prevent the accumulation of an alarming debt, which experience proved never would and never could be paid.

In other statutes, the Court recognized much of these same ideas. In **United States v. Reynes, 9 How. (U.S.) 127 (1850)**, the Supreme Court stated: "The object of the Legislature is manifest.it was intended to prevent speculation by dealing for rights of preference before the public lands were in the market The speculator acquired power over choice spots, by procuring occupants to seat themselves on them and who abandoned them as soon as the land was entered under their preemption right, and the speculation accomplished. Nothing could be more easily done than this, if contracts of this description could be enforced."

The act of 1830, however, proved to be of little avail and then came the Act of 1835 (5 Stat 251) which compelled the preemptor to swear that he had not made an arrangement by which the title might insure to the benefit of anyone except himself, or that he would transfer it to another at any subsequent time. This was preliminary to the allowing if his entry, and discloses the policy of Congress. "It is always to be borne in mind, in construing a congressional grant that the act by which it is made is a law as well as a conveyance and that such effect must be given to it as will

carry out the intent of Congress. That intent should not be defeated by applying to the grant the rules of the common law¼words of present grant, are operative, if at all, only as contracts to convey. But the rules of common law must yield in this, as in other cases, to the legislative will." **Missouri, Kansas & Texas Railway Company v. Kansas Pacific Railway Company, 97 US 49 1, 497 (1878.** "The administration of the land system in this country is vested in the Executive Department if the Government, first in the Treasury and now in the Interior Department, the officers charged with the disposal of the public domain under are required and empowered to determine so far as it relates to the extent and character of the rights claimed under them, and to be given, though their actions, to individuals. Government, and courts of justice must never interfere with it." **Marks v. Dickson, 61 US (20 How) 501 (1857);** see also **Cousin v. Blanc's ex., 19 How. US 206, 209 (1856).**

"The Power of the Congress to dispose of its land cannot be interfered with, or its exercise embarrassed by any State legislation; nor can such legislation deprive the grantees of the United States of the possession and enjoyment of the property granted by reason of any delay in the transfer of the title after the initiation of proceedings for its acquisition." **Gibson v. Chouteau, 13 Wal. (U. S.) 92, 93 (1871)**

State statutes that give lesser authoritative ownership of title than the patent can not even be brought into federal court. **Langdon v. Sherwood, 124 U.S. 74, 81 (1887)** These acts of Congress making grants are not to be treated both law and grant, and the intent of Congress when ascertained is to control in the interpretation of the law. **Wisconsin C. R· Co. v. Forsythe, 159 U.S. 46 (1895)** "The intent to be searched for by the courts in a government Patent is the intent which the government had as that time, and not what it would have been had no mistake been made. The true meaning of a binding expression in a patent must be applied, no matter where such expressions are found in the document. It should be construed as to effectuate the primary object Congress had in view; and obviously a construction that gives effect to a patent is to be preferred to one that renders it inoperative and void."

A grant must be interpreted by the law of the country in force at the time when it was made. The construction of federal grant by a state court is necessarily controlled by the federal decisions on the same subject. The United States may dispose of the public lands of such terms and conditions, and subject to such restrictions and limitations as in its judgment will best promote the public welfare, even if the condition is to exempt the land from sale on execution issued or judgment recovered in a State Court for a debt contracted before the patent issues." **Miller v. Little, 47 Cal. 348, 350 (1874)** Congress has the sole power to declare the dignity and effect if titles emanating from the United States and the whole legislation of the Government must be examined in the determination of such titles. **Bagneu v. Broderick, 38 U.S. 436 (1839)** It was clearly the policy of Congress, in passing the preemption and patent laws, to confer the benefits of those laws to actual settlers upon the land. **Close v. Stuyvesant, 132 M. 607, 617.** "The intent of Congress is manifest in the determinations of meaning, force and power vested in the patent. These cases all illustrate the power and dignity given to the patent. It was created to dives the government of its lands, and to act as a means of conveying such lands to the generations of people that would occupy those lands. This formula, "or his legal representatives," embraces representatives of the original grantee in the land, the contract, such as assignees or grantees, as

well as the operation of law, and leaves the question open to inquiry in a court of justice as to the party to whom the patent, or confirmation, should ensure." **Hogan v. Page, 69 US 605 (1864).**

The patent was and is the document and law that protects the settler from the merciless speculators, from the people that use avarice to unjustly benefit themselves against an unsuspecting nation. The patent was created with these high and grant intentions, and was created with such intentions for a sound reason. "The settlers as a rule seem to have been poor persons, and presumably without the necessary funds to improve and pay for their land, but it appears that in every case where the settlement was made under the preemption law, the settler entered and paid for the land at the expiration of the shortest period at which entry could be made" **Close v. Stuyvesant, 132 HI. 607, 623 (1890).** "We must look to the benefit character of the acts that created this grants and patents and the peculiar objects they were Intended to protect and secure.

A class of enterprising, hardy and valuable citizens has become the pioneers in the settlement and improvement of the new and distant lands of the government. **McConnell v. Wilcox, 1 Seam. (M.) 344, 367 (1837).** "In furtherance of what is deemed a wise policy, tending to encourage settlement, and to develop the resources of the country, it invites the heads of families to occupy small parcels of the public Land To deny Congress the power to make a valid and effective contract of this character would materially abridge its power of disposal, and seriously interfere with a favorite policy of the government, which fosters measures tending to a distribution of the lands to actual settlers at a nominal price." **Miller v. Little, 47 Cal. 348, 351(1874)** The legislative acts, the Statutes at Large, enacted to divest the United States of its land and to sell that land to the true sovereigns of this republic, had very distinct intents.

Congress recognized that the average settler of this nation would have little money, therefore Congress built into the patent, and its corresponding act, the understanding that these lands were to be free from avarice and cupidity, free from the speculators who preyed on the unsuspecting nation, and forever under the control and ownership of the freeholder, who by the sweat of his brow made the land produce the food that would feed himself and eventually the nation. Even today, the intent of Congress is to maintain a cheap food supply though the retention of the sovereign farmers on the land. **United States v. Kimball Foods, Inc., 440 U.S. 715 (1979);** see also **Curry v. Block, 541 F. Supp. 506 (1982)** Originally, the intent of Congress was to protect the sovereign freeholders and create a permanent system of land ownership in the country.

Today, the intent of Congress is to retain the small family farm and utilize the cheap production of these situations, it has been necessary to protect the sovereign on his parcel of land, and ensure that he remain in that position. The land patent and the patent acts were created to accomplish these goals. In other words, the patent or title deed being regular in its form, the law will not presume that such was obtained through fraud of the public right This principle is not merely an arbitrary rule of law established by the courts, rather it is a doctrine which is founded upon reason and the soundest principles of public policy. It is one, which has been adopted in the interest of peace in the society and the permanent security of titles. Unless fraud is shown, this rule is held to apply to patents executed by the public authorities. **State v. Hewitt Land Co., 134 P. 474,479 (1913)**

It is therefore necessary to determine exact power and authority contained in a patent. Legal titles to lands cannot be conveyed except in the form provided by law. **McGaffahan v. Mining Co., 96 U.S. 316 (1877)** Legal title to property is contingent upon the patent issuing from the government. Sabo v. Horvath, 559 P.2d 1038, 1040 (Aka. 1976) "That the patent carries the fee and is the best title known to a court of law is the settled doctrine of this court.**" Marshall v. Ladd, 7 Wall. (74 U.S.) 106 (1869)** "A patent issued by the government of the United States is legal and conclusive evidence of title to the land described therein. No equitable interest, however strong, to land described in such a patent, can prevail at law, against the patent" {Land Patents, Opinions of the United States Attorney General's office, (September, 1969)} "A patent is the highest evidence of title, and is conclusive against the government and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal." **Stone v. United States, 2 Wall. (67 U.S.) 765 (1865)** The patent is the instrument which, under the laws of Congress, passes title from the United States and the patent when regular on its face, is conclusive evidence of title in the patentee. When there is a confrontation between two parties as to the superior legal title, the patent is conclusive evidence of title in the patentee. When there is a confrontation between two parties as to the superior legal title, the patent is conclusive evidence as to ownership. **Gibson v. Chouteau, 13 Wall. 912 (1871)** Congress having the sole power to declare the dignity and effect of its titles has declared the patent to be the superior and conclusive evidence of the legal title. **Bagnefl v. Brodrick, 38 US 438 (1839)** "Issuance of a government patent granting title to land is the most accredited type of conveyance known to our Law". **United States v. Creek Nation, 295 US 103, 111 (1935); see also United States v. Cherokee Nation, 474 F.2d 628,634 91973).** The patent is prima facie conclusive evidence of the title. **Marsh v. Brooks, 49 U.S. 223, 233 (1850).**

A patent, once issued, is the highest evidence of title, and is a final determination of the existence of all facts. **Walton v. United States, 415 F. 2d 121, 123 (I0th Cir. 1969); see also United States v. Beaman, 242 F. 876 (1917) File v. Alaska, 593 P. 268, 270 (1979)** (When the federal government grants land via a patent, the patent is the highest evidence of title). Patent rights to the land is the title in fee, **City of Los Angeles v. Board of Supervisors of Mono County, 292 P.2d 539 (1956),** the patent of the fee simple, **Squire v. Capoeman, 351 U.S. 1,6 (1956),** and the patent is required to carry the fee. **Carter v. Rubby, 166 U.S. 493, 496 (1896); see also Klais v. Danowski, 129 N.W.2d 414, 422 (1964)** 1423 (Interposition of the patent or interposition of the fee title). The land patent is the muniment of title, such title being absolute in its nature, making the sovereigns absolute freeholders on their lands. Finally, the patent is the only evidence of the legal fee simple title. **McConnell v. Wilcox, I Scam (ILL.) 381, 396 (1837)** All these various cases and quotes illustrate one statement that should be thoroughly understood at this time, the patent is the highest evidence of title and is conclusive of the ownership of land in courts of competent jurisdiction.

This however, does not examine the methods or possibilities of challenging a land patent.

In **Hooper et al. v. Scheimer,,64 U.S. (23 How.) 235 (1859),** the United States Supreme Court stated, "I affirm that a patent is unimpeachable at law, except, perhaps, when it appears on its own face to be void; and the authorities on this point are so uniform and unbroken in the courts, Federal and State, that little else will be necessary beyond a reference to them." Id. at 240 (1859) A patent cannot be declared void at law, nor can a party travel behind the patent to avoid it. Id. A

patent cannot be avoided at law in a collateral, proceeding unless it is declared void by statute, or its nullity indicated by some equally explicit statutory denunciations. One perfect on its face is not to be avoided, in a trail at law, by anything save an elder patent. It is not to be affected by evidence or circumstances which might show that the impeaching party might prevail in a court of equity. A patent is evidence, in a court of law, of the regularity of all previous steps to it, and no facts behind it can be investigated. A patent cannot be collaterally avoided at law, even for fraud. A patent, being a superior title, must of course, prevail over colors of title; nor is it proper for any state legislation to give such titles, which are only equitable in nature with a recognized legal status in equity courts, precedence over the legal title in a court of law. The Hooper case has many of the maxims that apply to the powers and possible disabilities of a land patent, however there is extensive case law in the area.

The presumptions arise, from the existence of a patent, evidencing a grant of land from the United States, that all acts have been performed and all facts have been shown, which are prerequisites to its issuance, and that the right of the party, grantee therein, to have it issued, has been presented and passed upon by the proper authorities. **Green v. Barber, 66 N.W. 1032 (1896)** As stated in Bouvier's Law Dictionary, Vol. H, p. 1834 (1914): Misrepresentations knowingly made by the application for a patent will justify the government in proceedings to set it aside, as it has a right to demand a cancellation of a patent obtained by false and fraudulent misrepresentations. **United States v. Manufacturing Co., 128 U.S. 673 (1888);** but courts of equity cannot set aside, annul, or correct patents or other evidence of title obtained from the United States by fraud or mistake, unless on specific averment of the mistake or fraud, supported by clear and satisfactory proof, Maxelli Land Grant Cancellation, 11 How. (U.S.) 552 (1850); although a patent fraudulently obtained by one knowing at the time that another person has a prior right to the land may be set aside by an information in the nature of a bill in equity filed by the attorney of the United States for the district in which the land lies; Id.

A court of equity, upon a bill filed for that purpose, will vacate a patent of the United States for a tract of land obtained by mistake from the officers of the land office, in order that a clear title may be transferred to the previous purchaser; **Hughes v. United States, 4 Wall. (U.S.) 232 (1866);** but a patent for land of the United States will not be declared void merely because the evidence to authorize its issue is deemed insufficient by the court. **Milliken v· Starling's lessee, 16 Ohio 61·** A state can impeach the title conveyed by it to a grantee only by a bill in chancery to cancel it, either for fraud on the part of the grantee or mistake of law; and until so canceled it cannot issue to any other party a valid patent for the same land. **Chandler v· Manufacturing Co., 149 U.S. 79 (1893)**

Other cases espouse these and other rules of law. A patentee can be deprived of his rights only by direct proceedings instituted by the government or by parties acting in its name, or by persons having a superior title to that acquired through the government. **Putnum v. Ickes, 78 F.2d 233, denied 296 U.S. 612 (1935)** It is not sufficient for the one challenging a patent to show that the patentee should not have received the patent; he must also show that he as the challenger is entitled to it. **Kale v· United States, 489 F.2d 449, 454 (1973)** A United States patent is protected from easy third party attacks. **Fisher v· Rule, 248 U.S. 314, 318 (1919); see also Hooffiagle v· Anderson, 20 U.S. (7 Wheat.) 212 (1822)** A Patent issued by the United States of America so vests the title in the lands covered thereby, that it is the further general rule that, such

patents are not open to collateral attack. **Thomas v· Union pacific Railroad Company,588, 596 i1956)** See also **State v. Crawford, 475 P.2d 515 (A-riz. App. 1970)** (A patent is prima facie valid, and if its validity can be attacked at all, the burden of proof is upon the defendant); **State v. Crawford, 441 P.2d 586,590 (Ariz. APP· 1968)** (A patent to land is the highest evidence of title and may not be collaterally attacked); and **Dredge v· Husite Company 369 P.2d 676,682 (1962)**

(A Patent is the act of legally instituted tribunal, done within its jurisdiction, and passes the title. Such a patent is a final judgment as well as a conveyance and is conclusive upon a collateral attack) Absent some facial invalidity, the patents are presumed valid. **Murray v. State, 596 P.2d 805, 816 (1979)** The government retains no power to nullify a patent except through a direct court proceeding. **United States v. Reimann, 504 F.2d 135 (1974)** See also **Green v· Barker, 66 N.W. 1032, 1034 (1896)** (The doctrine announced was that the deed upon its face, purported to have been issued in pursuance of the law, and was therefore only assailable in a direct proceeding by aggrieved parties to set it aside) Through these cases, it can be shown that the patent which passes the title from the United States to the sovereigns, was created to keep the speculators from the land, is only able in a direct proceeding for fraud or mistake. In no other situation is it allowable for the courts, to imply eliminate the patent. One question that may arise is what do the courts mean by a collateral attack and what can be done by courts of equity if a collateral attack is presented?

Perhaps the easiest means of defining a collateral attack is to show, the converse corollary, or a direct attack on a patent. As was stated in the previous paragraphs, a direct attack upon a land patent is an action for fraud or mistake brought by the government or a party acting in its place.

Therefore, a collateral attack, by definition, is any attack upon a patent that is not covered within the direct attack list.

Perhaps the most prevalent collateral attack in Property law today is a mortgage or deed of trust foreclosure on a color of title. In these instances, it is determined that the mortgagee or another purchases the complete title and interest in the land in his place. Such a determination displaces the patentee's ownership of the title without the court ever ruling that the patent was acquired through fraud or mistake.

This is against public policy, legislative intent, and the overwhelming majority of case law.

Therefore, it is now necessary to determine the patent's role in American property law today, to see what powers the courts of equity have in protecting the rights of the challengers of patents.

The attitude of the Courts is to promote simplicity and certainty in title transactions, thereby they follow what is in the chain of title, and not what is outside. **Sabo v. Horvath, 559 p.2d 1038, 1044 (1976)**

However in equity courts, title under a patent from the government is subject to control, to protect the rights of parties acting in a fiduciary capacity. **Sanford v. Sanford, 139 U.S. 290 (1891).** This protection however does not include the invalidation of the patent. The

determination of the land department in matters cognizable by it, in the alienation of lands and the validity of patents cannot be collaterally attacked or impeached.

Therefore the courts have had to devise another means to control the patentee, if not the patent itself, as stated in **Raestle v. Whitson, 582 P.2d 170, 172 (1978)**, "The land patent is the highest evidence of title and is immune from collateral attack. This does not preclude a court from imposing a constructive trust upon the patentee for the benefit of the owners of an equitable interest" This then explains the most equitable way a court may effectively restrict the sometimes harsh justice handed down by a strict court of law. Equity courts will impose a trust upon the patentee until the debt has been paid. As has been stated, a patent cannot be collaterally attacked, therefore the land cannot be sold or taken by the courts unless there is strong evidence of fraud or mistake. However, the courts can require the patentee to pay a certain amount at regular intervals until the debt is paid, unless of course, there is a problem with the validity of the debt itself. This is the main purpose of the patent in this growing epidemic of farm foreclosures that defy the public policy of Congress, the legislative intent of the Statutes at large, and the legal authority as to the type of land ownership possessed in America. Why then is the rate of foreclosures on the rise?

Titles to land today, as was stated earlier in this memorandum, are normally in the form of colors of title. This is because of the trend in recent property law to maintain the status quo. The rule in most jurisdictions, and those which have adopted a grantor-grantee index in particular, is that a deed outside the chain of title does not act as a valid conveyance and does not serve notice of a defect of title on a subsequent purchaser. These deeds outside the chain of title are known as "wild deeds." **Sabo v. Horvath, 559 P.2d 1038, 1043 (1976); See also Porter v Buck, 335 So.2d 369, 371 (1976); The Exchange National Bank v. Lawndale National Bank, 41 ILL.2d 316, 243 N.E.2d 193, 195-96 (1968)** (The chain of title for purposes of the marketable title act, may not be founded on a wild deed. These stray, accidental, or interloping conveyances are contrary to the intent of the marketable title act, which is to simplify and facilitate land title transactions); and **Manson v. Berkman, 356 ILL. 20, 190 N. E. 77, 79 (1934)** This liberal construction of what constitutes a valid conveyance has led to a thinning of the title to a point where the absolute and paramount title is almost impossible to guarantee. This thinning can be directly attributed to the constant use of the colors of title. Under the guise of being the fee simple absolute, these titles have operated freely, but in reality, the evidence something much different.

It was said in common-law England, that when a title was not completely alienable and not the complete title it was not a fee simple absolute. Rather it was some type of contingent conveyance that depended on the performance of certain tasks before the title was considered to be absolute. In fact, normally the title never did develop into a fee simple absolute. These types of conveyance were evidenced in part by the operable word, since the conveyance and in part by the manner in which the granter could reclaim the property. If the title automatically reverted to the grantor upon the happening of a contingent action, then the title was by a fee simple determinable. **Scheller v. Trustees of Schools of Township 41 North, 67 ILL. App.3d 857, 863 (1978)** This is evidenced most closely today by deeds of trust in some states. If it required a court's ruling to reacquire the land and title, then the transaction and title were held by a fee

simple with a condition subsequent. **Mahrenholz v. Country Board of Trustees of Lawrence County, 93 Ill.App.3d 366, 370-74 (1981)** This is most closely evidenced by a mortgage in a lien or intermediate-theory state. These analogies may be somewhat startling and new to some, but the analogies are accurate. When a mortgage is acquired on property, the mortgagee steps into the position of a grantor with the authority to create the contingent estate as required by the particular facts. This is exactly what the grantor in Common Law property law could acquire. All the grantor had to do was choose a particular type of contingency and use the necessary catch words, and almost invariably the land would one day be refused due to a violation of the contingency. In today's property law, the color of title has little power to protect the landowner.

When the sovereign is unable to pay the necessary principal and interest on the debt load, then the catch words and phrases found in the deed of trust or mortgage become operational. Upon the occurrence of that event, the mortgagee or speculator, having through a legal maneuver acquired the position of a grantor, is in a position to either automatically receive the property simply by advertising and selling it, or can acquire the position of the grantor and eventually the possession of the property by a court proceeding. In Common Law, the grantor of a fee simple determinable where the contingency was broken or violated, could automatically take the land from the grantee holder, by force if necessary.

If however, the grant was a fee simple upon condition subsequent the grantor, when the contingency was broken, had to bring a legal proceeding to declare the contingence broken, to declare the grantee in violation, and to order the grantee to vacate the premises. These situations, though under different names and proceedings, occur every day in America. Is there really any serious debate therefore, that the colors of title used today, with the creation of a lien upon the property, become fee simple determinable and fee simples upon condition subsequent? Is this a legitimate method of ensuring a stable and permanent system of land ownership? If the color of title is weak, then how strong is a mortgage or deed of trust placed on the property?

Fee simple estates may be either legal or equitable. In each situation it is the largest estate in the land that the law will recognize. **Hughes v. Miller's Mutual Fire Insurance Co., 246 S.W.23 (1922)** If a mortgagee, upon the creation of a mortgage or deed of trust, steps into the shoes of the grantor upon a conditional fee simple, does it then mean the mortgagee has acquired one of the two halves of a fee simple, when cases have shown the fee simple is only evidenced by a patent? Actually, courts have held in many states that a mortgage is only a lien. **United States v. Certain Interests in Property in Champaign County, State of Illinois, 165 F.Supp.474, 480 (1958)** (In Illinois and other lien theory states, the mortgagee has only a lien and not a vested interest in the leasehold) See also **Federal Farm Mortgage Corp. v. Ganswer, 146 Neb. 635, 20 N.W.2d 689 (1945)** Even after a condition is broken or there is a default on a mortgage, a mortgagee only has an equitable lien which can be enforced in proper proceedings); South **Omaha Bank v. Levy, 95 N.W.603 (1902)** Strict foreclosure will not lie when mortgagor holds the legal title); **First** National **Bank v. Sergeant, 65 Neb. 394, 91 N.W. 595 (1902)**

(Mortgagee cannot demand more than is legally due); **Morrill v. Skinner, 57 Neb. 164, 77 N.W. 375 (1898)** (Mortgage conveys no estate but merely creates a lien);  **Barber v. Crowell, 55 Neb. 571, 75 N. W. 1 109 (1898)** (Mortgage is mere security in form of conditional conveyance), **Speer v. Hadduck, 31 Freeman (Ill.) 439, 443 (1863)** (Assignments or conveyances of